THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | No. 20 CR 559 |
| v. ) | |
| ) | Judge Virginia M. Kendall |
| MARKESE HILL, ) | |
| ) | |
| *Defendant*. ) | |

## MEMORANDUM OPINION & ORDER

Defendant Markese Hill is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Dkt. 2 at 1). This charge resulted from an encounter with Chicago Police Department ("CPD") Officers on March 5, 2020. (Dkt. 21 ¶¶ 1, 10). That evening, Officers Zachary Kuta and Jacob German ("the Officers") were monitoring a residential parking lot when they observed Hill briefly meet with an unnamed individual. The Officers followed Hill when he drove away from the parking lot and subsequently observed Hill commit two separate traffic violations. Hill eventually pulled into a parking lot and Officer Kuta conducted a traffic stop – leading to the seizure of a handgun from Hill's person and Hill's arrest. Hill moved to quash his arrest and suppress his firearm, claiming Officer Kuta lacked reasonable suspicion to conduct a traffic stop. (*Id.* at 4–5; Dkt. 37 at 7). On July 23, 2021, the Court held an evidentiary hearing. (Dkt. 33). The United States presented the testimony of CPD Officers Kuta and German; Agent David Calle of the Bureau of Alcohol, Tobacco, Firearms and Explosives; and photographic evidence and camera footage of the events in question. Hill presented the testimony of Shaunette Chaffin, his friend and witness to his arrest. After reviewing the testimony and evidence presented at the hearing, the Court denies Hill's motion to quash arrest and suppress evidence [21].

1

## **BACKGROUND**

Officers Zachary Kuta and Jacob German testified at the hearing. Both officers have served with the CPD for approximately four and a half years each. (Hearing Tr. at 7:9–10, 59:14–20). On March 5, 2021, they were assigned to patrol ABLA Homes, a Chicago Housing Authority complex, in an unmarked vehicle. (*Id.* at 8:24–9:5, 60:15–61:2). The Officers were monitoring this area because of its reputation for narcotics and gang activity. (*Id.* at 13:6–10, 60:6–7, 73:3–9; *see also id.* at 55:2–3 (stating it is a "known narcotic and gang loitering area which is the [site] of multiple shootings and other weapons offenses")). Officer German explained that one home adjacent to the parking lot where they were stationed that evening has earned a nickname of "the candy shop" because of the narcotics sales that occur there. (*Id.* at 71:6–15).

Shortly before 10 p.m. that evening, the Officers observed a dark blue sedan – later determined to be driven by Defendant Hill – pull into the parking lot. (*Id.* at 12:22–25). They saw Hill exit his vehicle and "linger around the area as if waiting for someone." (*Id.* at 13:6–8). A few minutes later, an unknown man exited one of the ABLA houses on the western side of the parking lot and approached Hill. (*Id.* at 13:12–14). This roused Officer Kuta's suspicions because, as he explained, "I have prior information [and] personal experience that that parking lot and those houses where the unknown male stepped out of [are] narcotic-related." (*Id.* at 33:19–21). Officer Kuta therefore "believed a narcotics-related activity was occurring" between these individuals. (*Id.* at 36:4–6, 37:2–4). Hill lingered with the unknown man for a short time until returning to his car. (*Id.* at 13:16–17). Shortly thereafter, the Officers observed Hill's vehicle departing the area. (*Id.* at 14:13–14). Because of Hill's suspected involvement in a drug transaction, the Officers pursued him in their unmarked vehicle. (*Id.* at 36:4–9, 37:1–5).

Officer Kuta then observed Hill commit two separate traffic violations. First, Hill failed to come to a complete stop at a stop sign at the intersection of 13th and Loomis. (*Id.* at 15:14–16:7, 43:8). Officer Kuta estimates, based on his experience on the job, that Hill was traveling 10 to 15 miles per hour as he passed through the intersection. (*Id.* at 16:1–7, 44:16–45:5). Second, Hill failed to activate his turn signal at least 100 feet before making a left turn into a parking lot. (*Id.* at 17:14–18:1 (explaining that Hill activated his turn signal only "while in the process of making [a] left-hand turn"); *see also* Dkt. 35 at 5). While Officer German could not provide corroborating testimony about Hill's first alleged traffic violation, (Hearing Tr. at 75:10–12; Dkt. 35 at 4 (explaining Officer German "was doing a safety check for cross-traffic and did not happen to directly observe whether [Hill's] car made a complete stop")), he did witness Hill's failure to appropriately use his turn signal, (*id.* at 64:6–8, 77:4–12, 83:13–21).[1] The Officers lack video evidence of either of Hill's purported traffic violations because their vehicle lacks a dash cam or other camera. (*Id.* at 10:16–21).

After Hill pulled into the parking lot, Officer Kuta activated his emergency lights to initiate a traffic stop. (*Id.* at 18:2–10). Officer Kuta approached Hill's vehicle and saw two women passengers seated in the car, including Shaunette Chaffin. (*Id.* at 19:9–15; *see also id.* at 104:24–105:3). Officer Kuta observed clear cups in the center console that were filled with red liquid

---

[1] Shaunette Chaffin – Hill's lifelong friend, (*id.* at 87:8–23) – testified at the hearing that Hill obeyed all traffic laws in the time leading up to his arrest. (*Id.* at 93:9–18 (stating Hill properly stopped at all stop signs), 94:4–7 (stating Hill used his blinker when turning into the parking lot)). Although her testimony directly conflicts with the Officers', Ms. Chaffin's credibility suffered during cross examination. At the least, the government showed that Ms. Chaffin has been unable to provide a consistent description of the events surrounding Hill's arrest – including with respect to her own behavior – over time. For example, Ms. Chaffin was interviewed by Agent Calle about a year prior to the hearing. (*Id.* at 104:24–105:16). She told Agent Calle that (1) there were no alcoholic beverages in Hill's vehicle at the time of his arrest, (*id.* at 108:1–12); (2) no liquor was found incident to the CPD's search of Hill's car, (*id.* at 109:7–9); and (3) she recorded part of the Officers' traffic stop, (*id.* at 110:6–25). On cross, she ultimately retracted each of these statements. (*See id.* at 109:20–22 (conceding that she had red wine in the car), 109:23–24 (conceding that wine was found incident to the traffic stop), 110:13–16 (conceding that she did not record the incident; that the other female passenger *did* record the incident; but claiming that the recording no longer exists)). Ms. Chaffin's vacillation concerning these underlying facts eroded her reliability as an eyewitness in this case.

which he believed to be alcohol. (*Id.* at 19:5–7). The car also smelled of alcohol and cannabis. (*Id.* at 19:7–8, 19:25–20:1). When Officer Kuta requested Hill's driver's license, Hill informed him that he only had a state ID. (*Id.* at 20:18–21, 21:1–5; *see also* Dkt. 35 at 5). Around this time, Officer Kuta also observed "a heavy object in [Hill's] upper jacket pocket with what appeared to be a handle." (Hearing Tr. at 21:9–14). Because Hill lacked proof of a driver's license and possibly held a firearm in his jacket pocket, Officer Kuta asked him to step out of his car. (*Id.* at 55:20–22). Officer Kuta had to repeat this request several times before Hill complied. (*Id.* at 21:22–22:3). Officer Kuta did not immediately inform Hill why he had to get out of his car. (*Id.* at 53:17–54:4; *see also id.* at 21:25–22:1).

When Hill exited the car, Officer Kuta "immediately saw the heavy object in his upper left jacket pocket again and immediately reached for it." (*Id.* at 22:5–7). Officer Kuta patted down Hill's upper left torso area and felt a "heavy object containing a handle" that he believed to be a firearm. (*Id.* at 22:7–8, 26:7–11). The Officers placed Hill in handcuffs, (*id.* at 22:16), and Officer Kuta recovered a .38 caliber Taurus, Model 85 handgun from Hill's upper left jacket pocket, (*id.* at 18–19; *see also* Dkt. 2 at 1). Hill told Officer Kuta that he did not have a valid Firearm Owners Identification card nor a Concealed Carry License and was placed into custody. (Hearing Tr. at 26:20–24).

## **LEGAL STANDARD**

Before conducting a traffic stop, police officers must have reasonable suspicion which amounts to "a particularized and objective basis for suspecting the particular person stopped" has violated the law. *Navarette v. California*, 572 U.S. 393, 396 (2014); *see also United States v. Jackson*, 962 F.3d 353, 357 (7th Cir. 2020) ("[A] routine traffic stop is more analogous to a so-called 'Terry stop' . . . than to a formal arrest. Thus, reasonable suspicion of a traffic violation

4

provides a sufficient basis to justify a traffic stop.") (citing *Rodriguez v. United States*, 135 S. Ct. 1609) (internal quotation marks omitted). "Reasonable suspicion arises from the combination of an officer's understanding of the facts and his understanding of the relevant law." *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014). Reasonable suspicion is always determined through the lens "of an objectively reasonable police officer." *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

Beyond reasonable suspicion, once an officer "has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (holding that officers did not violate the Fourth Amendment by arresting and taking woman into custody for failing to fasten her seatbelt and failing to provide proof of insurance). "When a police officer reasonably believes that a driver has committed a minor traffic offense, probable cause supports the stop." *Jones v. City of Elkhart*, 737 F.3d 1107, 1114 (7th Cir. 2013) (citation and internal quotation marks omitted); *see also United States v. Hernandez-Rivas*, 513 F.3d 753, 759 (7th Cir. 2008) (concluding that when an officer observes a vehicle changing lanes without signaling, the officer has probable cause for a traffic stop). In keeping with this, it is "not a violation of the Fourth Amendment to arrest an individual for even a very minor traffic offense." *Jackson v. Parker*, 627 F.3d 634, 639 (7th Cir. 2010); *see also Atwater*, 532 U.S. at 323 (holding that the Fourth Amendment does not forbid "a warrantless arrest for a minor criminal offense, such as a misdemeanor seat belt violation punishable only by a fine").

## **DISCUSSION**

### **I. Probable Cause Supported the Initial Stop**

The parties first dispute whether the Officers lawfully seized Hill in his vehicle. Committing a crime in the presence of law enforcement provides the "person-specific basis for

suspicion" required for a warrantless seizure to be reasonable. *United States v. Burnside*, 588 F.3d 511, 517 (7th Cir. 2009) ("[P]olice may arrest an individual if they have probable cause to believe that the individual engaged in criminal conduct, as an arrest supported by probable cause is reasonable by its very nature."); *see also Jones*, 737 F.3d at 1114. This holds true even where a driver committed "a very minor traffic offense." *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016). *See also Atwater*, 532 U.S. at 354 (holding that arrests for "very minor criminal offense[s]," if supported by probable cause, do not violate the Fourth Amendment); *Jackson*, 627 F.3d at 639 (same); *Chortek v. City of Milwaukee*, 356 F.3d 740, 745 (7th Cir. 2004) (same as to "minor, non-jailable" offenses).

There are two traffic violations mentioned that support the traffic stop—the failure to stop at the stop sign and the failure to signal properly for the turn. Officer Kuta testified that Hill failed to stop at a stop sign in violation of the Municipal Code of Chicago ("MCC") § 9-24-010(b). Officer German could not corroborate whether or not Hill failed to stop. (*Id.* at 75:10–12). Regardless of the this potentially conflicting testimony, the record nonetheless supports a conclusion that the stop was lawful. The MCC requires drivers to activate their turn signals "continuously during not less than the last 100 feet traveled by the vehicle before" making a turn. MCC § 9-40-200(b). Both Officers testified credibly that Hill failed to comply with this law as well, explaining that they observed his blinker in use only *after* he began making a turn. (*E.g.*, Hearing Tr. at 17:14–18:1 (Officer Kuta noting Hill's turn signal activated less than 100 feet from the turn, specifically while Hill was "in the process of making the left-hand turn"), 83:9–21 (Officer German noting Hill's turn signal activated "[a]s he was turning into the lot," less than 100 feet before the turn)). Hill's failure to properly use his turn signal gave rise to probable cause sufficient to conduct a traffic stop. *See Brooks*, 809 F.3d at 942–43 ("[The Officer's] testimony

6

that he saw [Defendant] change lanes without signaling establishes probable cause for the traffic stop, and [the] Officer could lawfully arrest [Defendant] for this traffic infraction."). Hill appears to challenge these findings by arguing that all the Government could point to as a reason for the stop "was the bare claim that [Hill's] . . . turn indicator did not go on soon enough." (Dkt. 37 at 8–9). To the extent Hill now attempts to minimize his traffic violation, the severity of the crime leading to his seizure is irrelevant. The fact that the Officers credibly testified that Hill committed even one minor traffic violation in their presence provides a constitutional basis for his arrest. *E.g.*, *Atwater*, 532 U.S. at 354.

Hill's other arguments that he was subjected to an unreasonable seizure are unpersuasive. Hill essentially sets forth that the stop at issue was pretextual and racially motivated. (Dkt. 21 at 4; Dkt. 37 at 9). In support, Hill highlights that there was no "testimony that the officers had viewed an [illicit] exchange of any kind [between Hill and the unknown man at the ABLA Homes] or any illegal or suspicious conduct." (Dkt. 37 at 5). He asserts that the Officers followed Hill's vehicle attempting "find a reason to stop the car," motivated by an unsubstantiated "hunch" that Hill was involved in narcotics-related activity. (Dkt. 37 at 6–7).

However, the Officers' subjective intent behind the seizure – specifically, whether they pursued his vehicle seeking a way to investigate a potential drug crime – is irrelevant. The law is clear that an officer's "subjective reason for making the arrest *need not be* the criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (emphasis added). Rather, "[s]o long as the police are doing no more than they are legally permitted and objectively authorized to do, an arrest is constitutional." *United States v. Willis*, 61 F.3d 526, 530 (7th Cir. 1995) (quoting *United States v. Trigg*, 878 F.2d 1037, 1041 (7th Cir. 1989)) (internal quotation marks omitted). The Supreme Court has further explained that "the fact that

the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Scott v. United States*, 436 U.S. 128, 136 (1978) (citing *United States v. Robinson*, 414 U.S. 218 (1973)).

These cases "foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved. . . . Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996). *See also United States v. Edwards*, 769 F.3d 509, 516 (7th Cir. 2014) ("Edwards's pretext argument [is] misplaced in the Fourth Amendment context. The reasonableness of a search does not depend on the officer's subjective motivations; the inquiry is, of course, objective.") (emphasis in original) (citing *United States v. Tinnie*, 629 F.3d 749, 753 (7th Cir. 2011) ("[I]n judging the constitutionality of a search or seizure, courts must look at the facts objectively")). The Court "look[s] to the record as a whole to determine what facts were known to the officer and then consider[s] *whether a reasonable officer in those circumstances would have been suspicious.*" *Edwards*, 769 F.3d at 516 (quoting *Tinnie*, 629 F.3d at 753) (emphasis in original). Here, Officers Kuta and German both witnessed Hill fail to use his turn signal properly as required by law. This traffic violation provided the probable cause necessary to seize Hill and his vehicle. It is irrelevant whether the Officers had an ulterior motive, like investigating a possible drug crime, for tailing Hill's car. Thus, the seizure did not violate Hill's Fourth Amendment rights.

## II. The Stop Was Not Unreasonably Prolonged

Hill next argues that the officers unreasonably prolonged the duration of the traffic stop in violation of the Fourth Amendment. (Dkt. 37 at 10 (alleging the traffic stop "lasted longer than

8

necessary to accomplish its supposed purpose")). Hill asserts that "there was no need for any additional search or seizure of the parties" and that he "still had not engaged in *any* illegal conduct of *any* kind" when he was ordered out of the car. (*Id.* at 10–11 (emphasis added)). The Government sets forth numerous arguments as to why it was proper to ask Hill to step out of his car during the traffic stop, including that the pat down was lawfully conducted incident to arrest and as a reasonably protective measure. (*See* Dkt. 23 at 9–12).

"[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop . . . and attend to related safety concerns." *Rodriguez*, 135 S. Ct. at 1614. The safety of police officers is inherently related to the mission of the stop itself which necessarily permits certain negligible intrusions into a driver's personal liberty in the interest of officer safety. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) ("[W]e are asked to weigh the intrusion into the driver's personal liberty occasioned . . . by the order to get out of the car. We think this additional intrusion can only be described as de minimis. What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety."); *Tinnie*, 629 F.3d at 751 ("During a valid traffic stop, an officer may order the driver and passengers out of the vehicle without violating the Fourth Amendment."). *See also United States v. Thompkins*, 833 Fed. App'x 648 (7th Cir. 2020).

Officer Kuta's order to have Hill step out of the vehicle was reasonably related to the mission of the traffic stop for purposes of ensuring officer safety. At the outset, and as discussed above, Hill was lawfully seized for committing a traffic violation. Therefore, the claim that he "had not engaged in *any* illegal conduct of *any* kind" when he was ordered out of the car is simply belied by the facts. Next, Officer Kuta testified credibly that he observed a bulge in Hill's jacket pocket. (*E.g.*, Hearing Tr. at 25:19–21). He explained the bulge appeared to be a heavy object

with a handle. (*Id.*). The bulge in Hill's jacket permitted an inference that Hill was armed, and thus posed a "serious and present danger" to Officer Kuta's safety, which justified the pat down. *Mimms*, 434 U.S. at 112 (citing *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968)). Other factors contributed to the reasonableness of the pat down, as well – including (1) Hill's demeanor at the time of the stop, which Officer Kuta characterized as "nervous and then easily agitated," (Hearing Tr. at 21:17–18); (2) the encounter occurred at nighttime in a high-crime area (*id.* at 55:2–3); and (3) Hill had recently been observed interacting with someone at a location associated with narcotics activity, (*id.* at 33:19–21 (Officer Kuta testifying, "I have prior information [and] personal experience that that parking lot and those houses where the unknown male stepped out of [are] narcotic-related")). (*See also* Dkt. 23 at 11). Under these circumstances, ordering Hill out of his vehicle amounts to a "negligibly burdensome precaution[ ] in order to complete [the officers'] mission safely." *Rodriguez*, 135 S. Ct. at 1616; *cf. Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (explaining that although an individual's mere "presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. . . . officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation"); *United States v. Ruiz*, 785 F.3d 1134, 1141 (7th Cir. 2015) ("Reasonable suspicion can arise from behavior that may in other circumstances be considered innocent; in other words, context matters.") (internal quotations and citation omitted); *United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010) (finding reasonable suspicion based in part on suspect's presence "in a location that was known to the officers to be a high-crime area plagued by drug trafficking and gun violence."). Hill suffered no Fourth Amendment violation in this case.

## **CONCLUSION**

For the foregoing reasons, Hill's Motion to Quash Arrest and Suppress Evidence [21] is denied.

_____
Virginia M. Kendall
United States District Judge

Date: October 29, 2021